The next case on calendar for argument and our final case is S.L. v. County of Riverside. S.L. v. County of Riverside I'd like to reserve five minutes for rebuttal. I'd like to address standing briefly, then qualified immunity, and then jurisdiction, unless the court would like me to address it in a different order. As to standing, the lower court erred with respect to holding standing. There was a material dispute of fact with respect to the standing as to V.L. because the lower court failed to analyze the second prong of California Family Law 7611D. The court didn't address the multiple factors laid out in In Re T.R. regarding whether or not the decedent, Yamis, openly held V.L. out as his natural child. The factors in In Re T.R., all of them should be answered in the negative, and that's not what the court found. The facts of the case as undisputed demonstrate that Yamis did not hold out V.L. as his natural child. With respect to the 14th Amendment standing issue as to V.L. and S.L., under the 14th Amendment analysis, the court also erred. Taking the facts in light most favorable to the non-voting party, Wheeler sets out the standard, which is that even biological parents must maintain consistent participation in a child's life and participation in child-rearing activities for the relationship to be entitled to Fourth Amendment protection. That is not what we have here. The facts show that Yamis did not demonstrate both consistent participation in either child's life or participation in child-rearing activities for the 14th Amendment protections to apply. Layer described it as significant custodial, personal, and financial relationship, and none of which was established here. I'd like to next move on to qualified immunity. The district court erred in holding that Sergeant Hubachek and Deputy McGuire are not entitled to qualified immunity as to both volleys. I'd like to start with the second volley. The second volley demonstrates the video of the Star 9 undisputably shows that the decedent Yamis was a serious and immediate threat to both officers and also to Lieutenant Walsh who was present. The video shows that he pointed the gun directly at the officers, not once but twice. And that is something that the court may consider as it is contradicted by any other evidence put forth by the plaintiffs. Can you tell me one thing and try to find the record? Maybe I missed it. Is there anything in the record that shows whether or not Officer McGuire was aware that a police canine had been killed? The officer Hubachek knew. I think the record shows that or at least was told about it. Let me look at my notes. I believe there is. You can – on rebuttal, you can – if you find it, you can do that rebuttal. Okay. Sure. Does it matter? Would the collective knowledge doctrine apply to that question? Are you asking me whether or not the knowledge imputed to Hubachek is also imputed to McGuire?  I believe that that would apply here, so that McGuire should have been aware also of the canine being shot. I'll move on to the first volley unless you have additional questions. I just want to – I didn't see in your opening brief where you argued that there's jurisdiction over an issue of fact because it was blatantly contradicted by the video. In our opening brief, we argued that there is jurisdiction over the materiality. Materiality only. Right. There is. In which case, we wouldn't be reviewing for blatant contradiction. I think you could find it under materiality because – and also, I think you could find it under the reasonableness of the court's finding of reasonableness. It's not explicitly set forth in our opening brief as to the contradiction, but Williams v. Sparks was cited, and Williams v. Sparks is the case law – is case law regarding uncontradicted evidence. And I think you could, again, also find it under what is a reasonable inference based on the evidence of what the jury could find. Well, maybe we can focus on the arguments you made in the briefing. Okay. With respect to the first volley, the lower court erred in holding that the actions by the officers were not objectively reasonable under their circumstances. We, again, argue, as Judge Song mentioned, regarding materiality of the facts. With respect to the first prong – excuse me, with respect to the first volley, the lower court erred in addressing facts that were not material and also addressing facts that – failed to address facts that we believed were material, including the knowledge that the canine was shot. I think that it demonstrates that it goes to the seriousness of Yamas' actions and that he was a serious threat. He was fleeing. He was wanted for crimes against – that were – those crimes were constituting crimes against other people that was harming other people, including armed robbery. And Officer McGuire was aware that he had used his gun in an armed robbery to beat someone. He was also charged – or wanted for molesting his niece. He shot the canine, which shows that the gun was live. He was willing to use it and that he was – would be willing to use it against police officers. The canine is technically property, but it still demonstrates that he would be willing to shoot something live and destroy something to not get caught. McGuire was also – the dispatch also shows that he had said he didn't want to go back to jail. He fleed. He was actively fleeing. This is like a pursuit that happened for several hours. The spikes in the road – he fled from the – sorry, he fled from the truck despite the spikes in the road. And even when the officers told him to drop the gun, he still didn't surrender. He was given multiple warnings, and he was aware that the police were after him. And that – the lower court had mentioned something about the dispute of fact with respect to potential mental illness. That, we believe, doesn't discount the possibility and the fact that he was still a serious and immediate threat. And – I think you lay out all the evidence that shows that he was dangerous, has a long criminal record, not cooperative. On the other hand, he was shot fleeing in the – he was not facing the officers at the time because he was shot in the butt. So obviously his back was turned to the officers. And when you look at the video, the body cams, you really can't tell much. At least I couldn't tell much. It's kind of too far away. Things are obscured. The helicopter video shows a little bit more. And maybe you could read it both ways. One, he's turning around, it looks like. I guess one way you could say is an officer thought that he has a gun and might shoot the officer. On the other hand, it might be he wasn't so blatant. He's turning around and pointing the gun. And maybe he's just looking to see where the officer is. I mean given that potential ambiguity, why wouldn't this be a fact issue for the jury to decide whether it's reasonable? I think the video shows that he definitely turned twice. And it's not – it doesn't completely support plaintiff's view that his gun was to his head the entire time. The gun actually disappears from view in the video. So the video also is – the Star 9 is about 2,000 feet, almost 2,000 feet above the ground. The officer's video is – body-worn camera video is obviously not great. And what it does do, both actually corroborate the perspective of the officers, and that is what the law requires. The law requires to analyze the officer's – what a reasonable officer would do in that – in what officers Hubachek and McGuire would do at that time. And when you're thinking about it, they viewed him turn, but they didn't know he was going to turn back. And I think a – I think what it shows is that the officers' perspectives from their deposition, taking Graham v. Connor – we have to take their perspective is that they believed that he had turned their gun towards them and they saw the gun. And the law asks us to look at what the officers believed in – a reasonable officer would believe in that perspective, and that is reasonable. With the threat, it was clear that at least one of the officers thought that he posed a threat to anyone that was in the house that he was running towards. Would that be sufficient enough justification for the shots? I think that the totality of the circumstances is what should be considered. Right. And the fact that it is a residential area, notwithstanding that it was also rural, it was without a doubt residential. And I think the video actually undisputedly shows that that house had the lights on and there was a car parked there. And so there was evidence in the record that McGuire had done a search a couple hours earlier that there was two individuals in that house. Well, I'm a little bit concerned because the district court, going back, said there was a reasonable dispute to go to the jury, a genuine dispute about whether the defendant was walking away or turning to the – and again, you argued in your opening brief – you didn't argue that we have jurisdiction to review those findings, which our review here is – jurisdiction here is limited in interlocutory review. So you argued about materiality, which I understood you to be saying even accepting all of the district court's findings about what were the genuine disputes and material fact. Even if we construe all those disputes in favor of the plaintiffs, we should still get qualified immunity. But Emma, I would like you – you're now shifting to saying we should revisit what she said was a genuine dispute and material fact. That's fair. I would say that, again, I would just focus on the fact saying that you could find it under both materiality and that you can take these facts presented because it's uncontradicted by video with Williams v. Sparks. And it's not a reasonable reference to make, and that's ultimately the holding of the court as to that a reasonable juror could find this. I would probably entertain that argument if you had made it in your opening brief. I think that's fair. So I would – I'm prepared to talk about the arguments you did make in your opening brief, which is even assuming that all the disputes that the district court found were genuine, were resolved in defendants' favor, they would still be entitled to qualified immunity. Right. I think it's a fair point, and I'll give our argument as to the second prong, clearly established right at the time. And we – I believe that the three cases that the court cited to find the second prong of qualified immunity are not – are defined at too high a level of generality, are not specific enough to demonstrate that the right was clearly established at the time. I think none of those cases – all those cases can be clearly distinguished. In George v. Morris, it was a man with a wheelchair – sorry, a walker, and his gun was pointed to the ground. And in Aguirre, it was a bat. And in Estate of Lopez-Gelhaus, it was a fake AK-7, and the – So just taking Judge Sun's point, if we assume that there was a question of whether or not the guns were pointed at the officers, but that it seems that it's clearly uncontested that he was perceived as a threat to anyone that was living in the residence, is that enough to establish qualified immunity? I think under these facts, that was a huge – that would be a really important factor under the totality of circumstances because the officers are not just protecting themselves. They are protecting the public, and that is a major concern. There was basically no way to perimeter him, as in – I believe it was George, where he was in a house. And there was no predicting the actions that he was going to take, considering his sign of pointing the gun to his head shows a man that is desperate. He had already killed a dog. So it demonstrates, I think, the public safety factor that is a really important factor in addressing reasonableness. My second question is if we were to agree with you on qualified immunity, would we need to reach the standing issues? No. Because everything would be discussed?  I'd like to reserve 30 seconds – or 25 seconds for rebuttal. We'll give you two minutes because I know we asked you a lot of questions. All right. Thank you. Good morning, Your Honors. Benjamin Levine here for the plaintiffs and the appellees, SLVL and Carolyn Campbell. I'd like to briefly address jurisdiction, which I think is an important issue in this case that wasn't very much addressed before, before turning to qualified immunity, and then to the state law claims, and then, if there's time after that, to standing as well. With respect to jurisdiction, as we outlined in our brief, and I think was touched on to some extent before by Judge Sung, this Court's precedent and the Supreme Court's precedent has constrained the scope of interlocutory appeals of qualified immunity. And this Court has set out a clear rule that in order to appeal qualified immunity denials, defendants are required to concede the facts and argue only the law. And that's clearly not what's been done here. There are a couple of important ways that the defendants have failed to conform to that rule. The first one being that there are a host of material disputes of fact that the district court identified. In their opening brief, the defendants have broadly asserted that those disputes are unsupported by the facts, and that's a clear challenge to those factual findings. I think we understand the jurisdictional limitations. I'll get to what my concern is. I think even if I resolve all the factual disputes identified by the district court in plaintiff's favor, I look at the precedent you cite and the precedent I look for independently, I don't see a case involving, for example, with respect to the second volley, where a court has clearly established that a victim who, well, someone who is essentially in a prolonged attempt to escape is armed, has a gun drawn, is shot, but is still not incapacitated. And the cases you cite essentially involve knives or bats, which I think are materially different from a gun with respect to the question of danger to the public. Sure, Your Honor. With respect, I understand, Your Honor, to be referring to the second volley specifically and on a clearly established prong. I mean, there are a number of cases that establish that continuing to shoot a suspect who's already down and no longer poses a threat. Do any of those involve a gun drawn? Not that we've cited from the Ninth Circuit. There are some district court opinions. But also, I think more broadly, the cases that we've cited for the first volley of shots support the less, how to put it, serious proposition regarding somebody who's already been shot, already down, continues to not pose an immediate threat to the officers at the time that the shots are fired, given that he's not facing the officers. He's down on the ground, chest down. And viewing the video, drawing inferences from the video in the plaintiff's favor, as reasonable juries could, a jury could conclude that the gun is not pointed at the officers at the time that the shots are fired. The second one or the first volley? Both. But I'm addressing the second volley. Certainly for the first volley. Even if the officer says the gun's pointing right at us? Well, I think that goes to the jurisdictional point, because an officer said guns pointed right at us after all the shots were fired, while the officers were running up to the decedent and were just a few feet away. And the decedent had sort of flopped over after all the shots had been fired. He's not in the same position that he was for any of the shots. And so I don't think that we can just assume that that's the exact position that he was in when the shots were fired. We can look at the video, though, right? I mean, we can take notice of the video. Well, yeah, the video is in evidence. But that said, the defendants have not argued that the district court's factual determinations are blatantly contradicted by any objective evidence, as Judge Sung pointed out. We can look at the video and come to a different conclusion, can't we? I think the court can view the video and it shows what it shows. But I think to the extent that anything in the video is ambiguous, this court's precedent supports that different jurors could view that in different ways. And that can itself, even from the same video, give rise to a dispute of material fact. But for the second volley, I mean, the video does show he's on the ground and he's holding the gun. He got shot, but he didn't drop the gun. He's holding the gun. He's on the ground. It is pointed. It shows that he falls on the ground, the gun still in his hand. He falls on his right side. And I guess as a consequence of that, initially, the gun is pointed generally to the south, not necessarily directly towards the deputies. But then that's not when the deputies fired their second volley. Importantly, he starts to sort of goes on to his left side, starts to crawl, faces west. The deputies are to his south, not to his west. And he pulls the gun underneath his body so that viewing the video from the helicopter in the light most favorable to the plaintiffs, as we have to do here on summary judgment, a reasonable inference is that the gun is not directly pointed at the deputies at that time. It's that his torso is in between the barrel of the gun and the deputies. And I think it doesn't show an immediate threat from him at that time, viewing the video and other evidence in the light most favorable to the plaintiffs. If I understand correctly, with respect to the second volley, even if all the factual disputes identified by the district court resolved in favor of the plaintiffs, it's undisputed that after the first shot, plaintiff was still moving, still trying to escape, still had the gun in his hand, still drawn. So he was not motionless. He was not incapacitated. And the step two of the qualifying immunity analysis, I think you're saying you don't know of any case in which we've said that at that point, it was unreasonable to shoot again. In the cases I've looked at where we've said it was unreasonable to shoot again, the plaintiff was holding something like a knife, which we distinguished from a case in which the, excuse me, not the plaintiff, the decedent was holding a gun, which because the threat posed by someone who's been shot but holding a knife is materially different from someone holding a gun. So I'm asking whether it was clearly established at the time that someone who had, and we have to look at this whole picture, someone who had been, officers were trying to arrest for a serious crime, who was in a long, drawn out attempt to escape, had, officers had reason to believe had used the gun during this escape and then was shot, but was still moving and had a gun. I don't see any case you cited or even a combination of cases saying that it was clear it would be unreasonable to think that he still posed a danger. I mean, I am assuming that a jury could find that was an excessive force. We have to find whether that was that was clearly established at the time. I understand, Your Honor. I think that there are multiple cases that we've identified, excuse me, that established that when somebody has a gun, whether or not they're incapacitated, but are not using the gun in a threatening way, are not making a harrowing gesture for the movement, things like that, not orienting the gun toward deputies at the time the shots are fired, that use of deadly force under those circumstances is excessive regardless. None of them involved the defendant, excuse me, sorry, the decedent where they were. I mean, here with the problem is none of them involved someone who is essentially evading arrest for a serious crime that armed robbery and had used their gun. I mean, not the cases where, you know, elderly man, you know, where I think their best case, the man with the rifle. There is no things happen very quickly. He was not being arrested. He was not. There was no reason to believe he had used his arm. I think the fact that there was reason to believe this scene used his firearm in this instance is a pretty during the interaction with the police is a pretty material fact. Sure. We have Harris versus Roderick, Your Honor, where the 9th Circuit held that use of deadly force against somebody who had shot and killed an FBI agent the day before at the same location as part of the same extended standoff during Ruby Ridge in Idaho was excessive. And we cited that in our brief. We said that to the district court below. And in that case, he's got his back turned. But I think that these cases that establish that somebody who has their back turned and in other ways don't pose an immediate threat with regard to a gun also clearly established the less extreme proposition that somebody who is no longer a threat because they're not only not facing and pointing a gun towards deputies, but also already shot down on the ground, maybe still able to move your honor, but still not able to pose an immediate threat. By virtue of moving around and again, not pointing the gun. And I just want to I also think it's important. We're focusing on the second volley here. I'd like to just quickly address the first volley as was discussed a few minutes ago. He's 150 feet away. He's got the gun pointed to his own head. It's true that he briefly looked to the left and then to the right a few seconds before the shots were fired. But in the seconds leading up to that, that first volley of shots, he continues facing forward gun to his head. There's no verbal threats. He's not pointing the gun toward the deputies. And I think the fact that the deputies testified in their depositions that they saw him at the time of the shots were fired, turning around backward, pointing the gun at them, which is clearly not shown on the video, raises credibility issues with regard to what they claim. Yeah, even if it's possible that he wasn't pointing the gun at them at the time of the shot, but he did pose a threat to anyone that was any residents in the house that he was approaching. Why was it not reasonable for the officers to think that to stop that danger, they had to shoot him? Sure. Well, number one, the defendants have not argued either in their motion or in this court that the officers could have shot based on a threat to anyone other than the officers themselves. They've only argued that the officers shot based on a threat to them because, again, he was pointing the gun towards them. And we think, as we argued in our brief, that any sort of fleeing felon argument is both forfeited and waived because it wasn't argued in the motion, wasn't argued in either brief on appeal. And with regard to the house, Your Honor, we tried to address this in the brief. Just to quickly explain, this is sort of a large property. There's a blue house to the left of the decedent as he's running. It was very clear that that was the concern of the officer, at least, I forget the name of the officer with the body cam saying. Lieutenant Walsh. Yeah. He said, we got to stop him before he gets into the house, essentially. Sure. Well, the officers all each testified that they could not have shot him and would not have shot him based on their training if he had not turned around and pointed the gun towards them, which is disputed. They said that if he had not, they testified that based on their training, if he had not done that, they would have continued to pursue him. He's not right up on the doorstep of any house. He's not even approaching the blue house. He's running parallel to it and past it, as we can see based on the video. He's not getting past it. I thought he was running up the driveway to get. There's the driveway has a fork, Your Honor. And so the left going left on the fork would have led to the driveway to the carport in the blue house. He took the right and was going. And you can see this clearly on the helicopter video from the time of the shot. So that the officers believe that there is a threat to the anyone that is in the residence. Why would they not be entitled to qualified immunity based on that? Well, number one, Your Honor, again, that's it's forfeited. I disagree with that. OK. Well, again, one reason would be, again, based on their training, they didn't think they could shoot based on that. It's not training. I mean, you have to tell me why it's unreasonable.  Well, this court has held in Drummond that training can be relevant to whether the use of force is reasonable and also as to clearly establish law. And also as well, Your Honor. I mean, there's no it's it's hard to say that they're an immediate. He's an immediate threat to people in the house when he's not going in the direction of the house. I think that a reasonable juror viewing this video could could conclude that he's not running towards the house. And that's a disputed issue. When we have to review whether a reasonable officer thought he would he was going towards the house. Well, I mean, it's it's not really a subjective analysis, Your Honor. I just want to be careful about that. What a reasonable officer thought a jury would have to determine that question, whether based on the evidence, a reasonable officer might believe that. Assuming it weren't immunity, don't we decide whether or not a reasonable officer would have perceived this threat? I think it might depend on which prong we're talking about here, Your Honor. With regard to prong one, I mean, this is a standard excessive force analysis that, you know, the disputed facts on this issue would have to go to a jury. We think that a reasonable jury could be. And just to be clear, the clearly established law analysis to prong two is still based on resolving all the disputed facts and inference, permissible inferences in plaintiff's favor, including ambiguities in the video that have to be resolved in our favor. Should we consider one big fact here is in terms of gram factors and potential risk to not the officers themselves, but also to potential people living in the houses is the fact that a police canine was shot and killed. I mean, that that's that's a clear overlay that the suspect already had used deadly force to kill a police canine. We had something worse again in Harris versus Roderick, Your Honor. He had shot and killed an FBI agent. And also to getting back to the argument from before, only one of the officers had information that a dog had possibly been killed is what the defendants argued. They haven't argued that deputy or Sergeant Hubachek had that information. Neither of the officers were actually present in the area when that shot was fired. So in a large respect, it's hindsight information. And I see him at my time. I mean, the Harris is that the Ruby Ridge case is different because one key thing the Ninth Circuit says there is the guy post no threat at all at the point. He was he was running to his cabin, didn't make any gesture, didn't make any movements. And there at that point, even though there was a shootout previous that you can't shoot a guy who's fleeing. Same here. Yeah, it's the same here. He's got a gun. He's not facing the officers. He hasn't. That's that's key difference. He has a gun. He's making movements. He's going to other people. He's going to his own cabin to Harris. I don't think Harris is at least definitely the clearly established prong. I don't think it really helps you. We really think that resolving the facts in plaintiff's favor, Your Honor, a reasonable jury could believe that an officer would not have seen him to be running towards the unoccupied house, that blue house. The deputies testified they couldn't have shot him if he if if he didn't turn around, that they couldn't have shot him just for fleeing. Whether or not to a house, this is different than the Blanford type situation where he's literally at the doorstep about to go in. And I'd like to I know I see him at my time. I just wanted to address the state law claims, if I might, for a moment. But, Your Honor. Yeah, question. If if if the officer entitled to qualified immunity, would would we need to reach the standing questions and things of that nature? Um. Well, I guess it would depend on the basis for if the court finds that the law was not clearly established, that doesn't do anything to our state law claims. There's no qualified immunity under state law in California. And in addition to that, there are different legal standards that apply to at least some of the state law claims, especially negligence. As this court has recognized into bars. What about the 14th Amendment claim? I mean, I think that. The 14th Amendment claimed it depends on a deliberate indifference standard, we argued. So I guess if the court found that the law was not clearly established for the Fourth Amendment, that probably would affect the fourth, the 14th Amendment as well. It wouldn't, again, affect any of the state law claims, which and which aren't properly subject to interlocutory appeal in the first place, as we argued in our brief. Thank you, Your Honors. Thank you. I wanted to address the court's question with respect to whether Officer McGuire knew about the canine being shot. In Lieutenant Walsh's body-worn camera video, he's there present when they were talking about the canine not coming back and the shot being heard. And then also in his deposition, ER-728, line 13 to 14, he's talking about how the canine, they were working on the canine who had a lethal wound about 200 to 300 yards behind him. And so I'd like to briefly address a couple comments by my friend here. I think that the standard is not whether or not there was an immediate threat to the people in the house, just solely on its own. I think that's one of the factors that the officers would take into consideration under the totality of the circumstances, is whether or not he's a serious and immediate threat to both of them. The people, as well as to the officers. And that it was a residential area. And with respect to this disputed issue as whether or not he turned or not turned or what the gun was doing with respect to the first volley, I think George B. Morris is on point. George B. Morris says, if the person is armed or reasonably suspected of being armed, a furtive movement, harrowing gesture, or serious verbal threat might create an immediate threat. And in this situation, the officers testified that they believed he was a threat. They had plenty of opportunity to shoot him when they first saw him on the road, walking. And then they followed him up the road, and they had no idea what he was going to do. And then just briefly, I want to correct something that was in our opening brief that was a mistake. And we apologize. I didn't correct it on the reply brief. We're citing to Sergeant Hubachuk's body-worn camera for audio statement. That's incorrect. It should be a citation to Lieutenant Walsh's body-worn camera. And unless the court has any more questions, that's it for me. Great. Thank you. Thank you both for the helpful argument. The case is submitted, and we are recessed for the day. All rise.
judges: LEE, BUMATAY, SUNG